HALBROOK et al. v. ORANGE ICE, LIGHT & WATER CO. (No. 2.)*

(Court of Civil Appeals of Texas. Beaumont. Oct. 28, 1915. Rehearing Denied Dec. 16, 1915.)

1. MASTER AND SERVANT ⬅124—MASTER'S DUTY OF INSPECTION.

The master is not relieved of the general duty he owes his servant to inspect the place of work to discover dangerous conditions unless by his contract of employment the servant is required to perform the duty of inspection himself, and such duty is one of the primary objects of the employment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242; Dec. Dig. ⬅124.]

2. MASTER AND SERVANT ⬅217—INJURY TO SERVANT—ASSUMPTION OF RISK—DUTY OF INSPECTION.

Where the employé of an electric lighting company, one of whose duties, among others, was to take down and replace any unsafe poles, was killed by the breaking off and falling of a pole against which he had been warned and which he had climbed to adjust a wire, which pole, of white cedar, had been put in new some four years before, the light company was not liable for such employé's death, since he had assumed the risk of injury as the duty of inspecting the pole rested on him.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. ⬅217.]

Appeal from District Court, Orange County; A. E. Davis, Judge.

Action by Alice Halbrook and others against the Orange Ice, Light & Water Company. From a judgment for defendant, plaintiffs appeal. Affirmed.

O. R. Sholars, of Orange, and Smith, Crawford & Sonfield, of Beaumont, for appellants. Bisland & Bruce, of Orange, for appellee.

BROOKE, J. Mrs. Alice Halbrook, for herself and as next friend of the minor children of herself and W. A. Halbrook, to wit, Mamie Sue Halbrook, Wm. W. Halbrook, and Jack A. Halbrook, filed her original petition, on which the case went to trial, on October 8, 1913, alleging substantially that her husband and the father of said children entered the employ of the defendant, which was engaged in conducting an electric light and power system in the city of Orange, and while in the discharge of his duties, he, on the 10th day of July, 1914, ascended one of defendant's poles supporting its wires, situated on Fourth street, in said city, and while on said pole the same, by reason of its age, rottenness, and defective condition, suddenly broke loose and fell to the ground, carrying with it the said Halbrook, and fell upon the said Halbrook, crushing, wounding, and bruising him in various parts of his body, and causing him internal injuries, which caused his death about four hours after his injury, and proximately caused by the negligence and carelessness of the defendant company in the following particulars, to wit:

(a) In having and using and permitting to be used the pole which broke with deceased, in a rotten, aged, and defective condition, as it was.

(b) In failing to properly inspect said pole or maintain a system of inspection of its poles, including said pole, and in this connection the plaintiffs allege that the pole was very much aged, and had been in use and standing where it was when it fell for at least 15 years, which was much longer than such poles remain in a safe condition, and that this fact particularly required inspection by the defendant company, and plaintiffs further allege that a proper inspection of the pole, as due care on the part of the defendant company, would have disclosed its rotten condition.

(c) In permitting grass and weeds to grow up and around the base of said pole, which obstructed the rotten condition of same and prevented its being discovered from sight that said pole was rotten.

(d) In failing to warn the said Halbrook of the age of said pole, or that same was or might be in a rotten condition and of the danger there might be in the condition it was in.

(e) In permitting the deceased to use such pole in such condition, and plaintiffs allege that the deceased did not know of the condition of the pole, and that it was no part of his duty to inspect said pole, any more than a casual observance of same, and that such casual observance of same would not have and did not disclose to the said Halbrook its condition, although the said Halbrook exercised due care in going up and in using said pole. The appellants, plaintiffs in the court below, further allege that said Halbrook at the time of his death was 32 years of age, and that he was an electrician by profession, was a capable, honest, and upright man, and that he was at the time of his death earning $80 per month, and was gaining proficiency and experience, having a reasonable expectation of soon commanding a salary of as much as $150 per month, and that by his death the plaintiff, his widow, was deprived of his earnings and services to her, and that she had thereby been damaged by reason of the premises in the sum of $20,-000, and that said minor children had been deprived of his earnings and services and of his nurture and care and attention as a father during their minority, and had thereby been damaged by his death in the sum of $10,000 each, all of which amount appellants seek to recover.

The defendant company pleaded general denial, and especially that the deceased had, by reason of his employment, full, complete,

---

and entire control, direction, and management of all the poles, wires, and connections of said electric plant outside of the plant proper, and that it was especially his duty to inspect and to replace all defective poles, repair all wires, or direct the replacing of said poles and repairing of said wires, and that he was warned and advised not to ascend the pole, and that deceased was guilty of contributory negligence, in that he, knowing the weakened condition of said pole, cut the wires supporting said pole, and that he was further negligent in attempting to ascend said pole on the south side of same, at the top of which there was a large iron box.

At the conclusion of the evidence introduced by all parties the court refused to submit the same to the jury, and the court instructed the jury to return a verdict for appellee. In due time the plaintiffs filed a motion for new trial, which was afterwards amended by their amended motion, on the hearing of which the same was by the court refused, to which action of the court plaintiffs, who are the appellants here, duly excepted, gave notice of appeal to the Court of Civil Appeals, and within due time filed their appeal bond, which was duly approved, and, 30 days having been allowed by the court in its order in which to file the statement of facts and bills of exception, the plaintiffs, appellants, within such allowed time filed their said statement of facts and bills of exception, and perfected their appeal to the Court of Civil Appeals at Galveston, which has since been duly transferred to this court. Appellant predicated error upon the action of the trial court in instructing the jury to find for appellee. The facts in this case appear to be as follows:

That some time in March, 1913, some correspondence was had between the appellee and deceased with reference to his employment by the appellee. There was no agreement between the parties at the time, but on April 16, 1913, appellee wrote the following letter to deceased, Halbrook:

"April 6, 1913.

"W. A. Halbrook, Weatherford, Texas—My Dear Sir: This morning when I reached the office it was to learn that the electrician we had employed about a month ago had skipped out during the night, without having intimated any dissatisfaction or suggesting such a move to anyone. This not only leaves us without an electrician, but right in the middle of a heavy job of conduit work in an office building. For this reason we wired you this morning as follows: 'Must have electrician at once. Can you come and when? Wire reply.'

"Very truly yours,        Sam C. Trimble,
                            "President."

There was no written contract of employment other than said letter set out above, but when deceased, Halbrook, reached Orange, he succeeded a man named Young, and entered upon the duties of said Young, the said duties being defined as follows (quoting from testimony of D. P. Hodges):

"As to what are the duties of an electrician, I will state that this is not a lineman's job nor an electrician's either. It is a combination man. I have known Mr. Halbrook since he has been here. He didn't succeed me. It was a fellow named Young that took my place. I believe Mr. Halbrook succeeded him. I don't think they had a man in between Mr. Halbrook and Mr. Young. I met him at the plant. Mr. Trimble [the general superintendent] employed him, I suppose. He hired all the men. I was not present when he hired him. Mr. Halbrook was at the plant. I worked with him maybe a day or two, but it was only when somebody would come up to my room when he wasn't here or at the plant. As to whether I ever had occasion to go with him on Fourth street, I will state that I was going out to deliver some lumber, and had to go up that way where they were at work to deliver the lumber. I saw him going up there when I wasn't busy, and he went with me right up Fourth street. He was going with me up Fourth street to put up a four-pin cross-arm on a pole. I saw him put up the cross-arm. I told him he was using a big one, and he said: 'I am going to move it out of there, on the corner.' I can't say how long that was before the accident."

He further testified that he worked for the defendant company for 22 years, and that he had never heard of an independent pole inspector in his life until upon the trial of this case; that it was the duty of the electrician to inspect the poles, and he was employed to keep it up; that the electric light company never had an inspector since he had known them; that he had never heard of the light company having any one to inspect the poles outside of the lineman. And he also testified that he cautioned Mr. Halbrook, the deceased, about this pole. He said that the pole had a crook in it, and that he warned Halbrook about climbing it; that, when Mr. Halbrook first came, he went over the system with him; and that he called his attention to things and told him that he could see for himself, and Halbrook said he was going to replace the poles as he could get to them. Further testifying, he says:

"That was a part of his duty. Mr. Halbrook took the place that I filled, and at Mr. Trimble's request I went over the line with him."

The witness Burr, defendant's general manager when Trimble was absent, testified:

"Halbrook erected all poles, put in lines, and connected them to the house; fixed the trouble in the lines. He employed all the assistance he needed to help him. He had charge of everything from the dynamo and switchboard to the end of the pole line, and he did it. I think the last time I saw him before the accident was the evening before. I think he left there before I got down that morning. Mr. Trimble, Mr. Halbrook, myself, and Mr. Gill were present. We were in the office. There had been an accident on Fourth street where a wire dropped down during a storm three or four nights before that. A horse had been killed by an electric wire. Mr. Trimble paid for the horse that morning, and we were talking it over. This was the first time Mr. Trimble had seen Mr. Halbrook, and he asked him how came the wire to drop down, and cautioned him to keep the line up tight. I called the attention of Mr. Halbrook to another bad place on that same street further down, where we have a main line laying across an insulator and not tied. He said he would not go to fix that. 'I can't climb that pole.' It was a pole in bad condition. Mr. Trimble said: 'If

it is in bad condition, don't climb it or any other that is in bad condition.' Mr. Halbrook said: 'I think I have got to put another pole there.' Mr. Trimble said: 'I want to know now if you intend to follow my instructions on that line.' Halbrook said he would."

Elspaugh testified that he had been working for the defendant company since January 30, 1914, and that it was the duty of a lineman to inspect the poles.

Jeff Gill also testified that he had been a lineman for the defendant company, and that while he was doing that work he inspected the poles, and testified that there was no independent or general inspection.

The deceased had been in the employ of the defendant company and performing his duties as set out above; that is to say taking down old and defective poles, putting up new poles in their place, and stringing the wires, etc., for more than 2 months before the accident occurred.

W. H. Hogg also testified:

"Mr. Halbrook had full charge of the wires, and nobody else was with it; nobody connected with the ice company helped him. He did it all."

J. B. Sargent also testified:

"There had been a light company man at that pole [that is, the pole at which the accident occurred] half a dozen times in two weeks before the accident. It was the trouble man, but I do not know whether it was this man [Halbrook] or not."

Joe Ratcliff also testified:

"The lineman is supposed to climb the pole and do any kind of top work."

And this witness also testified that he had lived in Orange for 38 years, and that the defendant company never had an independent inspector that he knew of.

The witness Burr further testified that Mr. Trimble is general manager, and that he (the witness) represented Mr. Trimble during his absence; that Mr. Halbrook's duty was to take charge of all of the electrical equipment; that he (Halbrook) erected all poles, put in all lines, and connected them to the house, and fixed the troubles in the lines; that he employed all of the assistance he needed to help him. "He had charge of everything from the dynamo switchboard to the end, of the pole lines, *and he did it.*" (Italics ours.)

There was testimony that it was not the duty of the lineman generally to inspect the poles, but there was no testimony that it was not the duty of the lineman at Orange to inspect the poles. As to the age of the pole the testimony is as follows:

"The pole was white or Michigan cedar."

And the witness D. P. Hodges testified:

"I put that pole there, and it was a new pole when I put it there, I don't know when I put it there. It was a good long time ago. I know that curb of Mr. Call's. As to whether or not we put it in there before or after that curb was put in, I will state that we had to cut it off and move it when they put in the curb. *I cut it off at the top of the ground and reset it then. It was all right then. It was sound. The condition of the pole was all right then.* I considered it a fairly good pole."

181 S.W.—48

It was agreed by the parties to this suit that George Call would testify, if present, that he put the curbing around his walk in front of his house during the latter part of April or the first of May, 1909.

Mr. Hodges, further testifying, says:

"I cautioned Mr. Halbrook about that pole [the pole from which the accident occurred]. This pole had a crook in it right here and I warned him about climbing it. I don't know anything about the condition of that pole in the ground except by the looks of the pole."

There was no controversy that there was nothing externally to show that the pole was not in good condition.

Joe Ratcliff testified that the pole that was broken was 8½ inches at the butt or top of the ground, and that the average life of a white cedar or cypress pole in this climate of that size would be anywhere from 7 to 10 years.

Jeff Gill testified:

"The defendant company did not employ an inspector of poles. While I was doing the work I inspected the poles."

As to the immediate accident W. R. Hogg testified:

"At the time Mr. Halbrook was killed I suppose I was about 30 feet from him. I rang up the ice plant to see if I could get the wire cut so as to get the house under them, and they told me to find Mr. Halbrook. Halbrook told me he would come the next morning. The next morning about 8:30 I found him at breakfast, and he said that he would come, and I waited for him and rode down in the wagon with him. He went around and looked at the north pole from the one that fell on him and shook it kind of, and attached a tie rope to it, and he went up the pole and cut the wire. One wire came loose on the pole with the transformer on it. That was the pole that fell on him, and he made the remark: 'I will have to go up and fix that damn wire.' He caught the pole and shook it, and it seemed like it would hold him, and I started to the closet right west of there, of where the pole was. I had gotten about 30 feet before the pole fell. He was right up about the transformer when the pole fell, about 4 feet from the top of the pole. The pole was about 18 or 20 feet high, and about 8 or 9 inches in diameter at the bottom, and tapered up to about 5 inches at the top. There was no weeds around the pole. The pole where we cut the wires at the corner of George Call's property. It was about 12 feet from the corner. It was a corner pole and about 12 feet from the intersection of Pine and Fourth—about 6 feet from Fourth street, and about 12 feet from Pine. It was about the same size pole as the other, the one he didn't climb. He didn't climb up this pole instead of the other because it was most dangerous to climb up this one that had the load on it, because it had more strain than the other. It was the main line wire running up and down Fourth street that was slipping. It was swinging down to the sidewalk. This pole [upon which the accident happened] had about 4 inches of heart that looked like it was doty a little. It wouldn't crumble. It was fairly sound. The sap was rotten and would crumble. I don't know whether or not it was worm-eaten. It broke off right at the ground."

The above is a résumé of the testimony with reference to the condition of the pole, and the time when the same was erected, and with reference to the duties of the deceased.

The appellants seem to rely largely upon

the case of Dupree v. Alexander, reported in 29 Tex. Civ. App. 31, 68 S. W. 739, the opinion in which was handed down by the Galveston court. A close reading of this case is needed in order to find if the same bears out the appellants' contention that it was authority for a reversal of the instant case. In that case the court says:

"The facts disclosed by the record are as follows: Appellee was employed by appellant as a lineman, and in that capacity was required to perform all work that was necessary to be done *on the top of or about the poles of appellant in the taking down and hanging of wires* [italics ours]. He was only employed to work with wires, but such employment included the climbing of poles and all work proper and necessary in the handling of wires. At the time he was injured he, with other employés of appellant, was engaged in the work of rearranging appellant's lines at the junction of McKinney avenue and Brazos street, in the city of Houston. Appellant's foreman, J. H. Brittigan, who was directing the work, *ordered appellee to ascend the pole* [italics ours] on which the arc circuit in said streets was fastened, and to cut everything off. There were an arc circuit and two guy wires attached to this pole. When he got to the pole, he kicked it two or three times to see if it was solid, and it seemed to be perfectly sound. He went up the pole and cut the wires as he had been directed by the foreman, and as he cut the second circuit wire the pole broke and fell with him, and he thereby received the injuries complained of. The pole broke from 8 to 12 inches under the ground. It was *rotten entirely* [italics ours] through at the place of the break, but was perfectly sound above the ground. If the pole *had not been rotten* [italics ours], he would not have fallen. Appellee was an experienced lineman, had worked in that capacity for four or five years, and had been working for the appellant for three weeks prior to the accident. He had before this taken wires off of old poles and put them on new ones, had repaired old lines, and worked on all kinds of poles, and knew that poles in the ground would rot. He did not know how long this pole had been there. It did not look like a new pole, but was apparently in good condition. It was a red cedar pole of at least an average size, being about 5 inches in diameter at the top and 12 inches at the bottom. It was appellee's habit as a lineman to kick old poles to test their soundness before going upon them. He knew that poles which had been up a short time are safer to handle wires on than poles which had been in use for a longer time. He did not discover any unsoundness in this pole when he kicked it, nor while climbing up to the cross-arm on which the wires were fastened. It seemed perfectly firm and steady. After reaching the cross-arm, he first cut the circuit wire on one side, then one of the guy wires, and then the circuit wire on the other side. The pole fell after he had cut the second circuit wire. * * * He could have cut both guy wires from the ground, but cut them from the top because the foreman ordered him to do so. It had no load above the ground, and was perfectly sound éxcept below the ground. * * * He did not know whether this pole had ever been examined; had never heard of the appellant sending any one to examine this or any of the poles."

The court further says in that case that one witness testified that he assisted in putting up the pole in question, and that it had been in the ground 6 years, and that it was perfectly sound when it was put up. Several witnesses testified that red cedar poles were the most durable pole that could be used,

and that the average life of a pole of this kind was from 10 to 25 years. Two of the witnesses for the appellant testified that all prudent linemen would inspect for themselves to see whether old poles which they were ordered to dismantle were rotten; that he would do this if he were directed to take down an old pole; that he always did this.

The opinion in the case of Dupree v. Alexander further says:

"There was nothing about the appearance of this pole to indicate that it was not perfectly sound. He was *acting foreman, in charge of the work at the time of the accident, and appellee was working under him, and had to obey his orders.*" [Italics ours.]

The court also says:

"The general rule of law that imposes upon the master the duty of using reasonable care to provide the servant with reasonably safe appliances and a reasonably safe place in which to work, and whenever, in the fulfillment of this duty, an inspection is necessary, it places the duty of such inspection upon the master, and not the servant.

*"The evidence shows that appellee was employed in the capacity of lineman, and that his duties were connected only with the handling of wires. He was not employed as an inspector of poles, and the erection or taking down of poles was not a part of the duties of his employment.* He was required by law to take notice of any obvious defect in any pole upon which he might be called to climb in the discharge of the duties of his employment, but he was not required to inspect the pole for latent defects. *There is no evidence in the record which would justify the conclusion that it was his duty, under his contract of employment, to make such inspection.*"

[1] The appellant could only relieve itself from the duty of inspection which it owed appellee by showing that under a contract of employment that duty devolved upon him as a primary duty. We do not mean to hold that the position of lineman and inspector might not be filled by the same person, but, when the master seeks to relieve himself of the general duty of inspection which he owes to his servant, he must show that by his contract of employment the servant was required to perform said duty, and that the same was one of the primary objects and purposes of the employment, and cites Railway Co. v. Butchek, 66 S. W. 335; Railway Co. v. Lindsey, 27 Tex. Civ. App. 316, 65 S. W. 669; San Antonio Edison Co. v. Dixon, 17 Tex. Civ. App. 320, 42 S. W. 1010; Railway Co. v. Crowder, 55 S. W. 387; Railway Co. v. Darby, 28 Tex. Civ. App. 413, 67 S. W. 446.

After citing the above cases in support of its conclusion, the court says:

"The evidence in this case merely shows that the appellant has never discharged its duty of inspecting its poles, had no system of inspection, and no persons employed whose special duty it was to make such inspection, but relied upon its linemen to perform that duty for themselves. The appellee had been in appellant's employment for only a few weeks, and it is not shown that he knew that the appellant had never inspected its poles, *or that he left their inspection solely to the linemen, to be performed or not, as they might elect.*"

And rightly says:

"We think under this evidence that appellee, when he went upon the pole in question, had

the right to presume that the appellant had performed its duty of inspection, and that the pole was safe, and that he did not assume the risk of its being rotten below the ground."

[2] We concur in the conclusion of the court and the judgment in the above case. But no such state of facts exists in the instant case. In the case before us Halbrook's duty, one of his primary duties, which he began immediately to enter upon and assume, was the taking down and replacing of poles that were in an unsafe condition, and, further, the facts of this case show that he knew the condition of the pole upon which the accident occurred, and had been warned by the defendant company as to its unsafe condition. Therefore the facts in the case above cited are not parallel with the facts in this case. The deceased did not rely upon any inspection or supposed inspection that had or should have been made by the appellee, but it was his duty, among others, to find and inspect the poles to see if the same were safe to ascend and work upon. We believe that in the case before us Halbrook assumed the risk, and that the duty of inspection was upon his shoulders, and that the appellee has not been shown to have been negligent in the premises.

The case of Southwestern Telegraph & Telephone Co. v. Tucker, reported in 102 Tex. 224, 114 S. W. 790, seems to be decisive of the instant case. The facts of that case, as stated by the court of Civil Appeals, were as follows:

"This suit was instituted in the district court of Brazos county some time during the year 1905, by the appellee, M. D. Tucker, to recover of the appellant damages in the sum of $1,999.-50 for personal injuries sustained while in the service of the appellant. The facts show substantially that the appellant owns and operates a line of telephone wires in and through the town of Bryan; that at the time the injury occurred it was necessary to cut the wire that passed over a certain street in the town of Bryan, in order to permit the passage of a church which was being moved. Clopton, who was * * * inspector of the appellant, and who had charge of that particular portion of appellant's line, was sent to Bryan for the purpose of having the work done. Upon arriving there he concluded that he needed the services of some other linemen to assist him in doing the work that was required to permit the passage of the church. He accordingly employed the appellee, Tucker, for that day only, to assist him in cutting the wires over the street along which the church was to pass. The appellee was instructed by Clopton to ascend the telephone pole on the north side of the street, and at the same time a man by the name of Eaves was directed to ascend another telephone pole on the opposite side. The instructions given to the two men were to cut the wires between the two poles, so that there would be no obstruction to the steeple of the building in passing. The linemen were to cut the wires at each end at the same time, in order to prevent some confusion resulting to the line. There were something like 18 or 20 wires to be clipped in this manner. When all had been cut except one, the pole upon which Tucker was working began to fall, and fell slowly for some distance, when it increased its motion, and fell rapidly to the ground, resulting in the injuries complained of in the appellee's original petition, and for which he recovered a judgment. The pole broke off just about the top of the ground; some of the witnesses testifying about an inch below the surface; all testify that it was rotten, and that only a small portion of the outer surface was sound; the dimensions of this rim of sound wood varying according to the estimate of the witnesses, some stating that it was one-sixteenth of an inch in thickness, while others make it a little thicker, but all agree that beneath the ground the pole was entirely rotten, and that the fall was occasioned solely by the fact that it was rotten. The evidence tended to show the pole had been in place something like six years, was of white cedar, and that the life of such poles varies from 10 to 15 years; 12 years being the general average. There is nothing in the record to indicate whether this pole was new when placed in its present position, or what its condition was.

" 'The evidence supports the conclusion that there had been no inspection further than a superficial observation of the pole after its erection; the appellee stating that when he was directed to ascend the pole he kicked it with his spur, as he generally did, for the purpose of ascertaining whether or not it was sound, and that to all appearances it seemed to be so; that he believed it was sound at the time he climbed it, and that it was sufficient to sustain his weight and the additional strain that would be put upon it by clipping the wires between that and the one on the opposite side of the street. No issue was made as to whether or not the pole was not otherwise properly sustained by guys, and that other precautions were taken to prevent an undue strain being imposed by releasing it from the support of the wires on the opposite side of the street; in fact, the rotten condition of the pole was shown to be the sole cause of its giving way at the time it did. The case was tried in the district court before a jury, resulting in a verdict in favor of defendant in the sum of $1,500 on the ———— day of September, 1905. From that judgment an appeal was taken, which was heard in the Court of Civil Appeals for the Fourth Supreme Judicial District, and the case was reversed and remanded. The case was again tried, resulting in a verdict in favor of appellee for the sum of $1,625, and from that judgment this appeal was prosecuted.'

"This writ of error was granted upon the ground that it was thought that there was no evidence of negligence on the part of the plaintiff in error. *We are still of the same opinion.* [Italics ours.] There can be no question but that the defendant in error was injured by the falling of the pole. If there was any negligence on the part of the plaintiff in error in not having inspected the pole sufficiently to have discovered the defects, or if there had been anything to indicate that the pole was rotten under the ground, it would clearly have been the duty of the company, through its inspector, to have examined the pole, which would have resulted in the discovery of the defect. The evidence discloses, so far as is known, that there was no reason to suppose that the pole was rotten; for, according to the testimony, the pole had been standing only for six years. The rottenness of the pole having been concealed by the ground, we fail to see that there was anything in the testimony tending to show that the plaintiff in error ought to have discovered it. We know of no rule of law that imposes upon the master the duty of looking out for defects in objects with which the servants are working, where there is nothing to indicate that any such defect existed. To so hold would be to make the master the insurer of the safety of the servants absolutely. As we have said, poles of the same character usually last unimpaired for a period of 12 years. To all appearances it was entirely sound, and we cannot see that there was anything to indicate that it required any more inspection than was given to it by the injured

party. The case narrows itself down to the question: What would a man of ordinary prudence have done under the circumstances; there being nothing in regard to the pole to excite any suspicion as to its soundness, or anything to indicate that a further inspection was necessary in order to test its sufficiency? We do not see how it can be said that an ordinarily prudent man would have taken any other steps in regard to it. The plaintiff in error also insists that the duty of inspecting the pole devolved upon the defendant in error. We find it unnecessary to pass upon the question. But in cases strikingly like this it has been so held by the courts of highest authority in the United States"—citing McIsaac v. Northampton Electric Light Co., 172 Mass. 89, 51 N. E. 524, 70 Am. St. Rep. 244; Flood v. Western Union Tel. Co., 131 N. Y. 603, 30 N. E. 196; McGorty v. Southern New Eng. Tel. Co., 69 Conn. 635, 38 Atl. 359, 61 Am. St. Rep. 62; Sias v. Warranted Lighting Co., 73 Vt. 35, 50 Atl. 554; Kellogg v. Tramway, 18 Colo. App. 475, 72 Pac. 609.

The opinion in the Tucker Case, supra, was delivered by Chief Justice Gaines of the Supreme Court, and we believe as in that case the case before us narrows itself down to the question: What would a man of ordinary prudence have done under the circumstances? The pole in question having been planted only for something like four years, and the deceased, Halbrook, having been warned with reference to the pole, and it being one of his primary duties to inspect it, we are of opinion that the duty of inspecting the pole devolved upon the appellant in this case, and not upon appellee, and we hold that the action of the court below in instructing the jury to bring in a verdict for the appellee was correct.

So believing, we overrule appellant's assignment of error, and the judgment of the court below is in all things affirmed.