## HALBROOK et al. v. ORANGE ICE, LIGHT & WATER CO.. (No. 113–2969.)

(Commission of Appeals of Texas, Section A. May 12, 1920.)

**Master and servant ⟨⟩286(24), 288(12), 289 (23)—Liability of master for injuries to servant held, under the evidence, for the jury.**

In action for injuries resulting in death to an employé of an electric company from the breaking of a telephone pole, due to its rotten condition underground, evidence *held* insufficient to show as a matter of law that employé had contractual duty of inspection, and that company was not negligent for failure to inspect, or that employé assumed the risk or was negligent.

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Action by Mrs. Alice Halbrook, for herself and as next friend of her minor children, against the Orange Ice, Light & Water Co. The Court of Civil Appeals affirmed a judgment entered on a directed verdict for defendant (181 S. W. 751), and plaintiffs bring error. Reversed and remanded.

O. R. Sholars, of Orange, and Smith, Crawford & Sonfield, of Beaumont, for plaintiffs in error.

J. B. Bisland, J. T. Adams, and E. L. Bruce, all of Orange, for defendant in error.

TAYLOR, J. Mrs. Halbrook, for herself and as next friend of her minor children, Jack A., Mamie Sue, and William W. Halbrook, sued the Orange Ice, Light & Water Company to recover damages for personal injuries sustained by her husband, W. A. Halbrook, while in the service of the company, which resulted in his death. The court instructed the jury to return a verdict for the defendant company, and rendered judgment accordingly. The Court of Civil Appeals affirmed the judgment. 181 S. W. 751. The writ was granted upon application referred to the Committee of Judges.

The deceased's injury was caused by the

falling of one of the company's telephone poles, which he had gone upon for the purpose of fixing a wire. It was a cypress or white cedar pole, 18 or 20 feet long, and was 8 or 9 inches in diameter at the top of the ground, where it broke off. It is undisputed that it broke because of its unsound and rotten condition, and that there was nothing visible before the break to reveal that it was decayed. The record does not disclose that he knew the pole was dangerous, or that he received any warning suggesting it might be rotten under the ground. Before ascending the pole, he shook it and sounded it with his spurs, and W. R. Hogg, who was with him at the time, said it seemed as if it would hold him.

Halbrook, when injured, had been working for the company only a short time, about 2 months. The company had been in business for more than 20 years. Its plant extended over all of Orange, a town at that time of 6,000 or 7,000 people. There is no evidence that Halbrook knew, or was furnished any data from which to determine, how long any of the poles, or the 'pole that fell upon him, had been in place. In fact, the evidence does not disclose that the company kept such information, or that it knew, or could have determined definitely, how long the pole in question had been in use. It is undisputed that the life of such a pole in the climate and soil in the vicinity of Orange, set new, is from 7 to 10 years, that one reset would not last so long. The evidence as to how long the pole causing the death of the deceased had been in use is somewhat vague. D. P. Hodges, witness for the company, who had been in its employ for 20 years, testified that at the time the curb in front of Mr. Call's house was put in the pole was cut off and reset. It was admitted that Mr. Call, if present, would testify that the curb was put in about 4 years before the accident. The Court of Civil Appeals states in its opinion that the pole, when it broke, had been planted 4 years, doubtless having in mind the foregoing testimony of Hodges as to the time of resetting. Such a deduction, as a matter of law, is not warranted in the light of all the testimony bearing on the length of time the pole had been in use. Hodges also testified that he planted the pole originally, and that it was then new, saying further:

"I don't know when I put it there; it was a good long time ago. * * * A pole rots right at the ground in this country, and a pole that has rotted off at the top of the ground we reset."

No witness testified definitely how long the pole had been planted. One stated that it had been in place 10 or 12 years, but his subsequent testimony was not positive as to the identity of the pole. Much of the evidence relates to inspection; plaintiff endeavoring to show that the company was negligent in not using ordinary care in respect to that duty, and defendant endeavoring to show that the duty of inspection devolved upon plaintiff. Interwoven with the evidence upon this subject is the testimony bearing upon the questions of assumed risk and contributory negligence. This testimony is not uncontradictory or conclusive in its nature. Two kinds of inspection of poles are alluded to in the testimony—the one, to keep the plant safe as a place of work, and discover such defective conditions, as in the nature of things peculiarly within the knowledge of the company, probably existed, but were not apparent; the other, such an inspection as an ordinarily prudent employé would make for his own safety in going upon the pole.

Jeff Gill, who had been in the company's service 10 years, testified that the man doing the work upon the poles 'inspected them; that he, when a lineman, did not go over the system for the purpose of examining the poles, and that no such inspection was made; also that he never dug around them to determine if they were sound. Hodges testified that the company had never had an independent inspector. The attorney for the company, in objecting to the admission of testimony as to whether it is the duty of a lineman to inspect the poles, stated in effect that the company had no system of inspection as such. There was testimony in effect that inspection of the poles of a telephone system is not a duty primarily of a lineman.

The following testimony, stated in substance, tends to show, in the absence of a specific contract of employment, what Halbrook's duties were, and whether they included as one of his primary duties that of inspection in the interest of the company in determining whether the poles were safe places for employés generally to work upon, as well as in the interest of his own immediate safety in going upon them. Briefly, it tends to show whether the company, by the terms of Halbrook's employment, placed upon him the obligation primarily resting upon it to use ordinary care to maintain its system of poles in such condition as to be safe for the employés exercising ordinary prudence to work upon.

Mr. Trimble, president of the company, conducted the correspondence terminating in Halbrook's employment. The letters in evidence show that he wrote Halbrook, at Weatherford, Tex., advising him of the prospective need of a man to do "inside wiring, shoot the trouble, keep up the lines, and read meters," adding that the duties referred to had been performed easily by the electrician then in its employ. Halbrook replied a few days later, stating what his experience had been as engineer, electrician, lineman, etc., and inquiring whether there would be any Sunday or night work, or any pulling of pumps and casings, in the event he accepted the employment. The company wrote Hal-

brook again March 27th, stating that ordinary trouble was answered until about 8 p. m., and that more serious trouble was answered at any time, Sunday included, saying, in this connection, that Halbrook would know what the duties of an electrician were. On April 6th, the company wrote Halbrook that it was without an electrician, must have one at once, and asked him to reply by wire, stating whether he could come. Following this correspondence, he came to Orange and took the job.

It does not appear more definitely from any of the testimony than the correspondence above referred to what the terms of the deceased's specific duties were under his employment. Its nature was such that ordinary care for his own safety required that the function of inspection, to a limited extent, at least, be discharged by him. There is testimony tending to prove that his position was not that of an electrician strictly, or that of a lineman, but that it was a position requiring the performance of duties ordinarily performed by both. There is testimony, also, that it was his duty to erect all poles, put in all lines, connect them with the houses, and fix all trouble in the lines; that he had charge of everything from the dynamo switchboard to the end of the pole line, and had such assistance as he needed; also that he had full charge of the wires, and looked after all of them without assistance.

It appears from the foregoing statement that the case turns upon the issues of whether the company was negligent regarding inspection, and, in this connection, whether Halbrook was charged under the terms of his employment with making inspections as one of his primary duties. The question for determination, concretely stated, is whether the court erred in instructing the jury to find a verdict for the defendant. In the event the company did not exercise ordinary care to have and maintain poles that were safe for Halbrook to work upon, but relied upon him to make inspections of such character as to discover a defect of the kind that caused his death, a peremptory instruction in its favor should not have been given; unless it further appears that such character of inspection was one of Halbrook's primary duties under his contract of employment. Dupree v. Alexander, 29 Tex. Civ. App. 31, 68 S. W. 739, writ of error refused.

The Court of Civil Appeals in reaching the conclusion that the action of the court in instructing a verdict for defendant was not erroneous, relied upon S. W. Tel. & Tel. Co. v. Tucker, 102 Tex. 224, 114 S. W. 790, as being decisive of that case, incorporating in its own opinion practically the entire opinion in that case. The Tucker Case and this case are strikingly similar in point of fact, in that in each an employé of a telephone company was injured by the breaking off at the surface of the ground of a pole upon which the employé had gone in the performance of duty. The pole broke in each case because of being rotten under the ground, and in neither was the decayed condition visible. Each employé tested the pole before climbing it, by shaking it and sounding it with his spurs. There is, however, at least one point of difference in the facts of the two cases that is highly material. In the Tucker Case the pole which fell with the employé had been standing for only half of the average period during which it was safe; whereas in this case the testimony is conflicting as to whether the defective pole, at the time of Halbrook's injury, had not already been in use for a period exceeding its average life, or at least long enough to indicate that it might be decayed under the ground. The principle upon which the Tucker Case is decided is that, while it is the duty of the company to use ordinary care to furnish its employés safe poles upon which to work, it was not incumbent upon it to insure their safety. The following language used by Judge Gaines in the opinion makes clear the view of the court that the company would not have been free from the duty of using ordinary care to discover whether the pole causing Tucker's injury was safe, had there been a question of fact as to whether it had been in place at the time of the accident longer than its average life:

"If there was any negligence on the part of the plaintiff in error in not having inspected the pole sufficiently to have discovered the defects, or if there had been anything to indicate that the pole was rotten under the ground it would clearly have been the duty of the company, through its inspector, to have examined the pole."

The foregoing excerpt states the law applicable, in our opinion, to the facts in this case. There was evidence tending to prove that the pole which broke with Halbrook had been in use for a period of time exceeding its average life. If it had, it was an indication that it probably was decayed under the ground. Whether it has been in use that long was for the jury to consider in determining whether the company was negligent.

The evidence does not, we think, warrant the conclusion, as a matter of law, either that the defendant in error was not negligent in the matter of inspection, or that Halbrook was charged under the terms of his employment with the duty of making such character of inspection as was necessary to discover the hidden defect in the pole, but is such as to make the general issue of company's negligence, and the issues of Halbrook's assumption of risk and contributory negligence, depend upon questions of fact to be determined by the jury.

We therefore recommend that the judgments of the district court and Court of Civ-

il Appeals be reversed, and that the cause be remanded for further trial.

SONFIELD, J., not sitting.

PHILLIPS, C. J. We approve the judgment recommended in this case, and the holding of the Commission on the question discussed.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes